FRANCES A. DRESSER & *als., in Eq. versus* JOHN DRESSER & *al.*

*It seems* that a gift *causa mortis* may be made *in trust,* for the benefit of third persons.

But where the donor, in anticipation of death, gave certain personal property to the defendants, to be managed by them as their own, and, with the proceeds of it, to be paid to his children at a specified time, *it was held* to be a gift *inter vivos;* and the donees were permitted to retain the property upon giving bond to execute the trust.

SUIT IN EQUITY.

The bill is inserted in a writ of attachment, dated Sept. 20, 1858. It alleges that Frances A. Dresser, Julius A. Dresser and Horatio S. Dresser, three of the complainants, are children of Asa Dresser, late of Saco, deceased; the

two latter being minors, and suing by their guardian; that Allen Haines, the other complainant, is administrator *de bonis non*, with the will annexed of the said Asa Dresser, and also a testamentary trustee under his will; that the testator, by his will dated January 14, 1854, after providing for debts and expenses of administration, and for an annuity in favor of his widow, directed that the residue of his property should be held in trust for his children; that he died in February following; that his will was duly proved; that his widow and the original executor have since both deceased, and that his only surviving children, the three complainants first named, now have the sole beneficial interest in his estate; that, after the decease of the executor and trustee named in the will, the complainant Haines was appointed, by the Court of Probate for York County, testamentary trustee under the will, and [subsequently] administrator with the will annexed, and was duly qualified under both appointments.

The bill further alleges, upon information and belief, that Asa Dresser, a short time before his decease, made a writing, not of a testamentary nature, and not executed conformably to the law for the testamentary disposition of estates, by which he undertook to provide for placing in the hands of the respondents certain valuable securities, amounting, at par value, to the sum of ten thousand dollars, to be held by them in trust for his children, together with the interest accruing thereon, upon certain conditions named in the writing. The complainants say they do not know whether that writing was, in fact, a valid creation and effectual declaration of trust, or whether it is capable of taking effect, nor, of their personal knowledge, that such a writing was, in fact, made; because they have never seen it, and do not know its contents otherwise than from the representations of the respondents. Nor do they know at what time, or under what circumstances the respondents came into possession of the securities referred to.

But they aver that the respondents do, in fact, hold such securities of the value stated, which were the property of Asa Dresser, and claim to hold them as trustees under the writing

in question, and represent themselves as having that writing in their hands.

Complainants further allege, that the respondents have for a long time — but how long is unknown to the complainants — collected and received the income of said securities to the amount of six hundred dollars annually, which, unless expended by them, is now in their hands, and held by them subject to whatever trusts were created by the writing aforesaid.

That the respondents, for a long time, designedly and wrongfully concealed, from all of the complainants, all knowledge of the fact that they held those securities, or claimed to hold them as trustees, or that any such writing was in their hands.

That, before the bringing of this bill, the complainant Haines, in his capacity of administrator and trustee, demanded of the respondents whether they held such securities, and upon what grounds they held them, and what was their form and tenor, — to which demands, the respondents, with hesitation and reluctance, at length admitted that they did so hold securities to the amount of ten thousand dollars, and claimed to hold them by virtue of a written paper signed by Asa Dresser, and stated that the securities were the bonds of the city of Portland in the sum of five thousand dollars, and a like sum in bonds of the Androscoggin and Kennebec Railroad Company. The said Haines then demanded of them that they should deliver these securities to himself as testamentary trustee. With this demand they refused to comply, and have ever since neglected and refused.

Complainants further allege, that the respondents have never given any security, in any manner, for the proper discharge of their alleged trust, or of any trust respecting those funds; that they have never rendered any account thereof to any person or tribunal; that they have not invested or secured the accruing income of the funds, nor applied it, in any manner in furtherance of the alleged trust, but have caused and suffered it to be applied to their own use.

The bill avers that these acts, omissions, concealments and neglects of the respondents, are against equity and good con-

science; and in violation of the law respecting trusts and the duty of trustees, and that these funds are greatly in danger of waste, misapplication and loss.

The complainants say that they have no adequate remedy at law in the premises, and pray the Court to take cognizance of the same in equity ; to the end, that after due proof, suitable order and direction may be given, by authority of law, for the proper management of said trust, if any trust was effectually declared by said writing, and is capable of being executed; if not, or if the respondents shall be found to have violated any trust reposed in them, or forfeited any privilege claimed by them, that the funds and securities may be decreed to be placed and disposed of, so that the intentions of the donor, whether as evidenced by his last will and testament, or by any other lawful writing, may be carried into effect, according to law.

The bill prays that the respondents may be held to make a full disclosure of all the grounds of their claim to hold said securities and funds, and of all the writing under which they pretend to hold the same, and of all the circumstances under which the securities and the writing came into their hands; that they be required to render a full and specific account of the bonds and securities and of the income thereof and application of the same, and for all such other and further relief as complainants may be entitled to. And prays for process, &c.

. In their joint and several answer, the respondents say, that Asa Dresser was brother of John Dresser, one of the respondents, and uncle of John W. Dresser, the other; that he regarded respondents with great friendship, and had confidence in their integrity and business capacity; that, for a long period before his decease, he was weak in body, though of sound mind; that during this period, while confident that he must finally yield to the disease with which he was troubled, he was in the habit of consulting these respondents in regard to his property, and confided to them his views with regard to the intended disposition thereof. That on the 5th day of

November, 1852, he wrote from Philadelphia to the respondent, John Dresser, a letter duly received by the latter.

(This letter, disclosing the manner he intended to dispose of his estate, was copied and made part of the answer.)

The answer further alleges, that the said Asa did substantially make the arrangements contemplated in this letter, and subsequently, in January, 1854, he, then living in Saco, requested respondents, one or both, to come to Saco and see him; that the respondent, John Dresser, was not able to go, but the respondent, John W. Dresser, did go, and arrived there on or about the twenty-first day of that month.

The respondent, John W. Dresser, severally answering, says, and the other respondent believes it to be true, that the deceased then and there called John W. Dresser and one Daniel Dresser, who is since deceased, into his private room, and there, without the presence of any other person, addressed John W. Dresser, in substance, as follows:—

"I wish to commit to you and your father (these respondents) a trust. I wish the fact of this trust to be kept from the knowledge of any one but my brother Daniel and yourselves. Brother Daniel will go to the bank with you and deliver to you certain bonds and scrip, which I place in your hands to do with as you would with your own. This paper, which I give you, will tell you what is to be the final disposition of the fund. I am anxious that my children shall not feel that they can live without effort on their part. I wish them to know nothing of this fund, so that they may acquire habits of economy and self-reliance, which they might not do after my death, if they had control of present means or even knew of the existence of this fund. I have fixed the age at which they will be entitled to receive the fund, as I have, in order that after their experience in an economical mode of life, they would be the better prepared to make a proper use of the means which will then be ready for division."

That the said Asa Dresser then delivered to John W. Dresser, the respondent, a writing of which the following is a copy:—

" $10,000.                    " Saco, January 21, 1854.

" Having confidence in my brother John and his son, J. W. Dresser, as friends, that they will take charge of a certain amount of property for safe keeping, consisting of city bonds or scrips, for the benefit of my children, when the youngest child is thirty years old, the amount may, with all the interest, be paid over to them in equal amounts. Said sum is now ten thousand. My brother John and his son, J. W. Dresser, shall be the trustees for the present. Daniel Dresser, of Saco, to be added when he thinks it consistent with his other responsibilities.                    " Asa Dresser.

" John Dresser, Castine,—John W. Dresser, Castine."

The answer further alleges that, at the time Asa Dresser delivered this written paper, he delivered to John W. the key of a trunk, in which he stated the bonds or scrip to be, in the vault of the Manufacturers' Bank, in Saco; that Daniel Dresser then accompanied John W. to the bank, at the request of Asa, and that John W. received the trunk alluded to, which was opened by him and found to contain five thousand dollars (at par) of the city of Portland scrip, and a like sum (at par) in bonds of the A. & K. R. R. Co. The former matures Nov. 30, 1865; the latter April 1, 1862, both payable to bearer, as will appear upon exhibit.

That after erasing the name of Asa Dresser from the trunk and placing thereon, " to the order of John and John W. Dresser," the trunk with its contents were again placed in the vault of the same bank, where they remained until January, 1858, when they were removed to Castine to save the trouble of having the securities so far from the residence of respondents.

The answer further alleges that, in compliance with the injunction of Asa Dresser, they did not inform the complainants, his children, of the fact of the trust, but that they have never used any improper means to conceal the knowledge of it from any person.

That as soon as respondents were aware that the complainants had obtained some knowledge of the trust, and that

their inquiries were not caused by a suspicion which might be quieted without divulging what the father had desired to be concealed, the respondents freely imparted to the complainants all the facts in regard to the trust.

That they accepted the trust, and have held the funds solely at the request and to carry out the wishes of the father, having simply a desire to discharge the duties imposed on them, when they received the trust; that they have not felt authorized to deliver up the funds, upon the request of the complainants or either of them, because Asa Dresser did not contemplate such an act, and the funds were not delivered to them for such a purpose.

That Horatio, the youngest child, will not arrive at the age of thirty years, as they believe, prior to the year 1870.

That they have never been requested by the complainants, or any one in their behalf, to furnish any bond to secure the performance of this trust, nor has the want of a bond, or fear that respondents might become irresponsible, ever been suggested as a reason why the fund should not remain in their hands.

That if any bond or security for the due performance of the trust had been desired from them, they would have furnished it, and they now offer to furnish the same, if, in the opinion of the Court, it is necessary or desirable.

This case was argued at July Term, 1859, by *Barnes & A. Haines,* for complainants.

The contest in this cause, arises upon the matters disclosed in the answer.

Whether upon the case stated in the bill, or in the answer, it is necessarily within the cognizance of the Court, as a Court of Equity and trusts. *Morrice* v. *Bishop of Durham,* 10 Vesey, 537; *Raynham* v. *Trustees, &c.,* 23 Pick. 148.

The title of the respondents must be made out either on the ground of *donatio inter vivos,* including declaration of trust *inter vivos* — or of *donatio mortis causa.*

I. Not a *donatio inter vivos,* because the whole case shows

that the transaction was not to take effect immediately and absolutely, without reference to death.

Plainly a *post mortem* disposition, the answer so admits and avers; so avowed in the Philadelphia letter, and the answer says that the design thus avowed, was substantially carried out in the actual transaction.

The arrangement was revocable, "ambulatory." *Dole* v. *Lincoln*, 31 Maine, 422.

II. Not a *donatio mortis causa*, because, though resembling this in some respects, such as expectation of death, and reference to contingency of death; yet there was no such gift to any one, as the law requires.

The gift was not so made as to be absolute to any one upon the death of the donor.

The donor intended to retain the *dominion* of the thing after his decease.

No gift to the trustees, because the terms are merely, "take charge," "for safe keeping."

No gift to the children, because the fund was not to belong to them, "*presently, as their own property*," upon the death of donor, but was still to be controlled by authority of the donor.

Precisely and peremptorily so determined in the case of *Dole* v. *Lincoln*.

There is no definition of *donatio mortis causa*, and no adjudged case in the books, which permits the subject to be placed in the charge of one person, to be held and managed by him, for another, according to rules and conditions laid down by the alleged donor.

III. Cases of mere agency, the gift placed in the hands of a third person, for mere delivery to the donee, are familiar, and consistent with the definition, and easily distinguishable from this case.

IV. Cases are found, where a person, into whose hands the gift comes, is said to be "trustee" for another; such as *Borneman* v. *Seidlinger*, 21 Maine, 189; *Howard* v. *Menifee*, 5 Pike, 668, and other like cases, where the trust relation

arises by implication of law, from the position of other parties, not from any purpose or declaration of the donor.

V. A proposition is found stated, Hill on Trustees, p. 66, to this effect;—"it has been decided, that a *donatio mortis causa* may be made to the trustee for a particular purpose."

The case cited is *Blunt* v. *Barrow*, 4 Brown's Chancery Cases, 75; and a later edition of Hill cites *Moore* v. *Darton*, 7 Eng. Law and Eq., 134.

See also the case of *Blunt* v. *Barrow*, as reported in 1 Ves. jr., 546, and *Hills* v. *Hills*, 8 Mees. & Wels. 401.

The cases cited in Hill, do not support his text.

The case in Mees. & Wels. upon its own facts, is no authority, those facts not requiring any such doctrine; and its reference to the case of *Blunt* v. *Barrow* is undiscriminating.

In the two cases above cited, where the Courts speak of a "condition" or "trust" coupled with the gift, the facts do not show any thing, as a *condition* imposed by the donor, but only the statement of a *motive*, inducing the gift.

No other cases are found, where any such doctrine is even mentioned.

VI. A correct proposition under this head appears to be this:—if one wishes to continue his own dominion over his own property after his decease, he must do it either by an act in proper testamentary form, or by an act of disposal which is irrevocably completed while he is alive. There is no intermediate third mode of doing this, by *donatio mortis causa*.

VII. The transaction in question cannot be upheld as a declaration of trust *inter vivos*, because, manifestly, upon the evidence the case was not so. As before stated, the whole thing was contingent upon death by that sickness. This evident contingency of the gift repels that hypothesis of the case.

VIII. To uphold this transaction, would violate the rule of "the utmost caution." *Dole* v. *Lincoln*.

The suspicious circumstances of the case require this rule to be rigorously observed.

These circumstances are, not merely the sickness, for coun-

sellors and friends might be present, as, one week before, when the will was made, but the absence of all disinterested witnesses; the large amount of property thus alleged to be disposed of; the alleged injunction of secrecy to be maintained for so long a time; the actual injustice to the wife; the practical disinheritance of the children, and the omission of all securities and safeguards.

The rule of "the utmost caution" also exacts the most ample proof, not merely uncontradicted testimony, but evidence, consistent with all probabilities, and sufficient to overcome, clearly and satisfactorily, all contrary presumptions.

Here, the whole case depends upon the testimony of one witness, deeply interested as a party.

IX. Important incidents of the transaction are unjustifiable, and unlawful, in the sense that the courts of law will lend no aid, in upholding an act so characterized.

Instead of *secrecy*, the policy of the law demands publicity in death bed dispositions of property.

The alleged *motive* towards the children cannot be defended, and the Court will not execute such a purpose. The Court will pronounce it the duty of the parent, not to play tricks upon his children, but so to educate them, while he lives, that they can bear whatever fortune, much or little, his death may cast upon them.

X. If the transaction was invalid, the present trustees hold, only "for those who take under the disposition of the law," (Lord Eldon, in *Morrice* v. *Bishop of Durham, ubi supra,*) and must be decreed to place the fund in the hands of the legal representative.

XI. The situation and conduct of the respondents require a decree against them.

1. A principal part of the alleged design of the deceased has failed by the death of Daniel Dresser. The deceased evidently sought to place the whole affair under the watch and control of Daniel, though affecting (and for an evident improper purpose) to postpone his nominal function as trustee.

Whether he failed through ignorance, or the infirmity of

disease, to provide a substitute, is immaterial. It results, that the fund is not now where the deceased intended to place it, and the alleged trust is incapable of being executed, as designed. The respondents hold the fund, therefore, only "under the law," not under the writing, which has become ineffectual.

2. The mere willingness of the respondents to accept such a trust, under such circumstances, should be rebuked, so that the voice of the law may hereafter deter the perpetration of such improvidence and injustice, in the secrecy of a death chamber.

3. The actual falsehood, voluntarily practiced by the respondents in reference to this fund, shows them unworthy of any trust. Nor can the allegation that secrecy and deception were enjoined upon them, as a duty of the trust, relieve their position. The Court cannot decree that falsehood may be lawfully enjoined, or knowingly committed.

4. When the secret was detected, it was the duty of the respondents, at the least, to submit their case voluntarily to the Court in equity, for its direction. Their refusal to do so, or to surrender the fund except upon compulsion, shows the inequitable design, with which they hold their position and purpose.

5. Their long omission to invest or secure the accruing income is a direct violation of the first duty of a trustee. It is nothing to say that they are pecuniarily responsible, for, under such circumstances as this case discloses, liability of a fund to misapplication and loss is a conclusion of law, however rich the trustee may be. They are not merely without bond and without security, but, in their hypothesis of the case, they are not accountable to any tribunal, nor removable by any power. At least, nothing but the chance detection of their secret has brought them within the reach of this Court. In the next case of like impression, it will only need the good fortune of escaping detection, to give to the pretended trustees an utter immunity.

By statute, a testator may exonerate his testamentary trus-

tee from giving bond, subject however, to the better judgment of the Probate Court. But he cannot exempt him from the liability to account, nor from the liability to be removed.

XII. The whole policy of our law is contravened, and the constitution and function of the Courts, for the administration of estates, are neutralized and abrogated, if *post mortem* trusts are withdrawn from the convenient and prompt jurisdiction of the Court of Probate, and forced to be transferred to the cumbersome and dilatory procedure of a court of general equity.

And if such *post mortem* trusts as this can be fabricated in secrecy, and carried along at the pleasure of the trustees, unknown to all but the trustees themselves, for a series of years, distinctions of jurisdiction are not worth mentioning, for the whole body of the law for administrations and testamentary trusts is practically repealed.

*Shepley & Dana*, for the respondents.

Asa Dresser, a man of independent fortune, delivered certain securities to the respondents, to be held by them in trust for a particular purpose, and finally distributed under certain conditions.

The distributees claim the securities before the conditions are fulfilled; they claim as heirs, on the ground that the trust is void.

If the donor could make the above disposition in favor of a stranger, he could make it in favor of his own heirs. He had the absolute property in the fund, and could annex to its disposition such conditions (under limitations to be hereafter noticed) as he saw fit to impose.

I. He made a good gift *inter vivos* to his children, and delivered it to the respondents to hold in trust for the donees. The delivery was complete, and sufficient of itself to pass the property. The direction as to the mode of distribution does not deprive the gift of its legal character. Immediately upon delivery the donor's dominion over the fund ceased.

A gift of this nature is often made under circumstances

similar to those made on the expected approach of death; and, in *Marston* v. *Marston*, 1 Foster, 491, such a gift is expressly upheld.

II. If not a valid gift *inter vivos*, it is still a good *donatio mortis causa*.

Every thing which must concur in order to render such a gift valid existed in fact at the time of the transaction.

The donor might have legally bestowed these securities absolutely upon these respondents, if he had seen fit; and there is no rule or principle of law to prevent his accompanying the gift with directions as to the final disposition of the fund.

No case can be found where the principle contended for by the complainants has been established.

On the contrary, in many cases where gifts coupled with conditions have been called in question, the courts have sustained them.

It is well known, that for a long time gifts *mortis causa* were looked upon with suspicion, and those were formerly held invalid which are now sustained. It was only after repeated decisions to the contrary, that the House of Lords, on appeal, decided that choses in action, bonds, &c., are proper subjects of such gifts.

While such was the tendency of the courts, however, the case of *Blount* v. *Barrow* was decided in 1792. This case has been relied on ever since, by Judges not apt to overlook the point adjudged, as *establishing* the doctrine that a gift *mortis causa* may be coupled with a condition.

The case · is not very fully reported, either by Brown or Vesey; but the language of the Court was, that the gift being for a particular purpose did not prevent its being a good *donatio mortis causa*.

In that case, the evidence as to the terms of the donation, was derived from the answer of the donee. This answer divulged the fact that the gift was made for a particular purpose; and, if that had been fatal, then the Court would hardly

have directed an issue of law to find whether it was made in expectation of the approach of death.

The actual state of the law in regard to donations like the one at bar is stated by Story (1 Eq. Jur. § 607, &c.) as follows:—"According to the civil law, a donation *mortis causa* may be made subject to a trust or condition. *Eorum quibus mortis causa donatum est, fidei committi quoque tempore potest....* The point does not seem to have been directly-established in modern equity jurisprudence; *but the manifest inclination of the Courts is to sustain such a donation although it is coupled with a trust or condition.*" [See 1 William's Executors, &c. 655,* ed. of 1849.]

In *Hambroke* v. *Simmons*, 4 Russ. Ch. R. 25, there was a gift of a mortgage debt, which the donee was to hold and not collect principal or interest till the death of the donor, and, at the decease of the donee the security was to go to her children. Counsel argued in regard to the effect of the condition, which, if illegal, would of itself have been fatal to the gift; but Sir John Leach, Master of the Rolls, after commenting on the evidence, and stating that there was great doubt as to the *facts*, directed an issue in the following words— "whether the testator made any gift by way of *donatio mortis causa* of the mortgage debt due to him from James Pollard."

As in *Blount* v. *Barrow*, this issue would have been unnecessary, had the admitted *trust* rendered the donation void.

The case of *Marston* v. *Marston*, (*ub. sup.*) was a case where certain notes were placed in the hands of the *executor* of the donor, the proceeds of which were to be applied to the support of the donor's child. The Court held that, after the delivery, the executor was trustee for the special purpose designated, and sustained the gift.

Subject to the rights of creditors, a person is allowed to dispose of his property by will, to whom he pleases; or he may bestow the whole upon any one by a gift to take effect presently, or at his decease. The books are full of cases where donations of the latter description are delivered to persons other than the donee. The donor directs the gift to

be delivered at his death. Why should he be deprived of the right to say that the gift shall not be delivered within a period fixed by himself.

There is no limit fixed by law upon the right of a testator to postpone the time when his legatees shall enter on the enjoyment of his bounty. Public policy, which is opposed to accumulation of enormous fortunes by accretion of interest, demanded some limit to *that* postponement, and the want was met by Statute 39 and 40 Geo. III, c. 98. The disposition by gift does not differ, save in its mode of proof, from a testamentary disposition; and no reason can be adduced why, the proof being satisfactory, a gift should not be enjoyed upon terms as well as a testamentary bequest. In the opinions of the Judges of the Exchequer in *Hills* v. *Hills,* 8 M. and W. 401, (since Story wrote Eq. Jur.) the question is very aptly put.

The ingenuity of counsel. is exercised in an attempt to show that the Judges of that Court, which stands as high as any in the world, not only mistook the nature of the case before them, but failed to discover the simple point decided in the case relied on by them as authority in determining that cause.

We have already alluded to the reasons why the decision of the Court in *Blount* v. *Barrow* is an actual acknowledgment that a donation *mortis causa* can be made for a particular purpose.

It remains to say that *Hills* v. *Hills* was a case in the determination of which *Blount* v. *Barrow* was directly in point. In that case, the testator, being involved in a suit, gave certain India bonds to the respondent for the *purpose of prosecuting that suit.* The fund was placed in the hands of the donee for a particular purpose. It is no answer to the facts, to say that the prosecution of the law-suit was simply the motive of the gift. The question is not one of motive, for to all gifts there must be some motive, but whether a thing given for a particular purpose or on certain conditions, can be held on those conditions or for that purpose.

Counsel says the Court of Exchequer overlooked the fact, that the donee of these bonds was the residuary legatee of the donor and would have thus received the bonds. But that does not meet the case. If the donee, as legatee, would have received the bonds under the will, this would not have rendered it obligatory on him to expend the amount in the prosecution of a suit in which, up to the exhibition of the will, he had no interest. The very fact that, while such legatee, the Court considered him entitled, and so held him obliged to use the fund for the purpose expressed by the donor in his gift *mortis causa* and did *not* allow him to hold it as a residuary legatee under the will, is conclusive on the point, that a donation may be made for a particular purpose, or in other words upon condition.

Courts may be said to have gone to this extent, that in gifts *mortis causa* the donor may designate the purpose for which, and the time when, his bounty is to be expended. In addition to the cases cited, see *Drury* v. *Smith*, 1 P. Wms. 404; *Tate* v. *Hibbert*, 4 Br. Ch. Rep. 286*; *Wells* v. *Tucker*, 3 Binn. 366.

*Dole* v. *Lincoln*, cited by complainants, did not turn upon any such question as is presented here. The counsel and Court both took it as past dispute that a *donatio mortis causa* could be made in trust, and the whole question in that case, was, whether the trust were or not void for *uncertainty*. The opinion of the Court, in declaring the affirmative, *assumed* that such a donation could be coupled with a proper trust. The Court do not there lay down the rule of "utmost caution" as quoted by counsel. The language made use of referred to gifts to charitable uses merely, and in the cases there cited all the donations were sustained.

Counsel attempts to raise a distinction between the effect of a gift *inter vivos* and *mortis causa*. It is virtually admitted, and indeed is indisputable, that an absolute gift of the first description may be made upon such terms or conditions as the donor sees fit to impose. Those of the second description *are also gifts inter vivos, subject to be defeated only by the*

*donor's recovery.* Gifts of the first description are perfected by tradition; of the second by tradition followed by the decease of the donor; when both these things concur, the dominion of the donor is divested. If the gift be upon trust, the property in the thing rests between the trustee and the beneficiary, as in other cases of trust. That the trust was declared on the donor's death bed, or in expectation of the approach of death, does not alter the case.

This is in the nature of a bill of discovery and relief.

The answer sets out fully the nature of the gift, and the grounds on which respondents claim to hold the fund. That answer is not contradicted, and conclusively establishes the existence of the facts as stated. Adams' Equity, 363*; 3 Greenl. Ev. § § 284, 288.

If Asa Dresser had the legal right to make the gift disclosed, neither his *motives* nor the circumstances under which the gift was made or the trust carried out justifies the interference of the Court.

The answer shows that Dresser had confidence in the respondents; that, for some years prior to his death, he had contemplated placing certain funds in the hands of respondents in trust; that, on the 21st of January, 1854, shortly after his will was made, the testator delivered to them securities to the amount of $10,000, at par value, to be managed by them as they would do with their own, and finally divided among his children; that the testator enjoined secrecy on them, that his children might be kept in ignorance of the amount, lest the expectation of this fund, to be added to what they came into possession of under his will, might not induce those habits of economy he desired to inculcate.

The case shows that he left property beside this, which in his opinion was sufficient for their support, though one of the plaintiffs preferred to have their " property all together," and thought this fund needed for their comfortable maintenance.

It will be seen that all the securities become payable before they are to be distributed under the terms of the instrument

declaring the trust; the respondents were directed to do with the fund as their own until the time for distribution came, and then deliver principal and interest to the heirs.

There is nothing in the disposition of this property which would have authorized the Court to interfere, had the declaration of trust been more formally drawn. The testator had the right to say what portion of his estate his children should enjoy immediately upon his decease, and as to what portion their enjoyment should be postponed. A more formal declaration would have availed simply because it would have been satisfactory evidence to the Court of his intention.

The uncontradicted evidence of intention here is also sufficient.

The Court is not to look behind an instrument, making an otherwise legal and proper disposition of property, to ascertain what causes or motives induced that disposition; and, here, when the Court finds that Asa Dresser placed property in the hands of these respondents, to be held by them for a certain time and then distributed, it makes no difference what motive caused this act, if *that act was one he had a legal right to do.*

If he was mistaken in thinking it would be for the benefit of his children to be kept in ignorance of his act, that mistake can have no reflex power sufficient to defeat the act itself.

The respondents did not seek this trust. It was imposed on them by a relative, who had sufficient confidence in their integrity to place it in their hands to do with as their own until the fulfillment of the time fixed by himself. They were not required by him to invest the interest from year to year, but they are ready to account for it, and profess themselves ready to give what security the Court may require for the due performance of the trust.

The intention of the donor is clear. The respondents desire to carry it out. It is for the Court to say whether that intention shall yield before the impatience of the donees.

*Barnes* replied.

The opinion of the Court was delivered by

DAVIS, J. — Asa Dresser, the father of the complainants, a few weeks before his death, delivered to the respondents a writing of which the following is a copy: —

"$10,000.                              " Saco, January 21, 1854.

" Having confidence in my brother John and his son J. W. Dresser, that they will take charge of a certain amount of property for safe keeping, consisting of city bonds or scrips, for the benefit of my children, when my youngest child is thirty years old, the amount may, with all the interest, be paid over to them in equal amounts.   Said sum is now ten thousand.   My brother John and his son J. W. Dresser, shall be the trustees for the present.   Daniel Dresser, of Saco, to be added when he thinks it consistent with his other responsibilities.                              " Asa Dresser."

At the time this writing was delivered to the respondents, Asa Dresser said to them, that he wished them to do with the property as they would with their own; and he thereupon delivered it to them.   They were enjoined from divulging the fact to his children, until the time when the whole amount should be paid over to them according to his written declaration aforesaid.

The complainants, having discovered the transaction, though the time for the distribution has not yet arrived, now seek to recover the property, on the ground that such disposition of it was illegal and invalid.   And it is argued that it was not a gift *inter vivos*, to the trustees; nor valid as a gift *causa mortis*, because made *in trust*.

This last proposition has been ably discussed; and the counsel for the complainants has commented at some length upon the case of *Blount* v. *Barrow*, 4 Brown, C. C., 75, and subsequent cases in which it has been cited.   The argument is, that in none of these cases has a gift *causa mortis, in trust*, been held to be valid.   But if this is so, it does not sustain the proposition of the complainants.   It simply results that the question is still unsettled.   For we do not know of any case where such a gift has been held to be *invalid*.

The law has never been so strict in regard to the disposition of personal property as of real estate, in expectation of death. Infants could make testaments of chattels, though not of lands. 2 Blacks. Com., 497. And, at common law, it was not necessary for such testaments to be in writing. 4 Kent's Com. 516. Gifts *causa mortis* are a sort of off-shoot of this principle, surviving the statute prohibition of verbal wills. And though once looked upon with disfavor, and still carefully scrutinized by the Courts, when they are found to have been made in good faith, they should be upheld.

Gifts *inter vivos*, and gifts *causa mortis*, differ in nothing, except that the latter are made in expectation of death, become effectual only upon the death of the donor, and may be revoked. Otherwise the same principles apply to each. And as the former may be made *in trust*, we can see no reason why the latter may not. The learned counsel has not shown us where such a gift infringes on any decided case, or on any established principle of law. Nor is it objectionable from considerations of public policy. The danger of fraud and deception is certainly less than in the case of a gift to the donee in his own right. If the gift is *in trust*, the donee has little, if any, personal interest in sustaining it. And when such a gift is proved to have been made in good faith, and the trust is definite, so as to be enforced in a Court of Equity, we are unable to perceive why it may not be upheld.

In the case of *Dole* v. *Lincoln*, 31 Maine, 422, the gift was held invalid, not on the ground that it was *in trust*, but because, if it was a gift, which was doubtful from the testimony, it was for a trust so indefinite and uncertain that it could not be executed.

But we do not think it is necessary to a determination of this case that we should come to the conclusion that a gift *causa mortis*, in trust, may be valid. For, if the transfer in this case was a gift, it was a gift *inter vivos*. The donor was sick, probably with no hope of recovery. This clearly was the reason why he made this disposition of a part of his property, after having made his will a week previous. Assum-

ing it to have been a gift, it was made in anticipation of death,—*but it was not conditioned upon that event.* There is no intimation, either in the writing, or in the oral testimony, in regard to the transfer, of any expectation or right on his part to reclaim the property, under any contingency. Nor is such a gift, to children, accompanied by delivery, revocable. *Smith* v. *Smith,* 7 C. & P. 401.

And, though no words of gift are in the writing, it is to be construed according to the intention of the donor. And, giving to the language its natural meaning, under all the surrounding circumstances of the case, we cannot doubt that it was a gift, *in trust,* for the benefit of his children. The *res gestæ* corroborate this construction. The donees are called "trustees." The property was delivered to them, so that they had entire dominion over it. They were instructed to do with it as they would with their own, until the time of final distribution. The trustees, and the *cestuis que trust,* are all named in the writing, which is signed by the donor; the objects are definite; and the time and manner of the final disposition of the fund is fixed with certainty. We therefore think the trust should be upheld according to its terms. It violates no rule of law or of public policy; and the final distribution will be made at the same time, and on the same principles, as it would be by the administrator, under the will, if we should grant the prayer of the complainants.

But we think that the safety of the complainants requires that the trustees should furnish a bond to the *cestuis que trust,* for the performance of the trust, as they offer to do. We also think that it was the duty of the trustees, using the property as their own, to invest the accruing interest from year to year; and, so far as they have neglected to do it, after a reasonable time, they should be held personally responsible. A decree may therefore be made, that the funds may remain in the hands of the respondents until further order of Court, upon their filing a bond as trustees, with sureties to be approved by some one of the Justices of the Court, with the condition that they shall faithfully execute the trust, invest

the interest annually as it shall be paid, and account for the use of any that they have neglected to invest, and finally pay over the whole, principal and interest, according to the terms of the trust, subject to such compensation as may be allowed them by this Court for their services. And, under the peculiar circumstances of this case, we order that neither party shall recover costs.

TENNEY, C. J., and RICE, APPLETON, and GOODENOW, J. J., concurred.